FILED
2013 May-24 AM 08:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **WILLIAM MEYER RODDY** and **WENDY SUE RODDY,** | ) ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | )   **Civil Action No. CV-11-S-4355-NW** |
| | ) |
| **CITY OF HUNTSVILLE, ALABAMA,** *et al.*, | ) ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Dr. William Meyer Roddy, M.D., and his wife, Wendy Sue Roddy, allege that the City of Huntsville, Alabama, and two of its police officers violated rights protected by the United States Constitution and state laws during a series of events that flowed from a search of a Huntsville hotel room shared by the Roddys and their children.[1]  That search resulted in plaintiffs' arrests on drug charges that later were voluntarily dismissed by an Assistant State District Attorney.[2]

Plaintiffs' original complaint was not limited to just the three defendants discussed in this opinion.  Instead, it scattered claims like a shotgun blast at two municipal corporations — the Cities of Sheffield and Huntsville, Alabama — and six

---

[1] *See* doc. no. 72 (Second Amended Complaint).

[2] *Id.* ¶ 29.

Huntsville police officers: *i.e.*, Sergeant Jason Ramsey and uniformed patrol officers Terry Lucas, Clarence Thornberry, Brett McCulley, Dewayne McCarver, and Anthony E. McElyea.[3]  This court subsequently dismissed with prejudice the claims against Officers Thornberry, McCulley, McCarver, and McElyea.[4]

Plaintiffs then filed an amended complaint, again asserting claims against the Cities of Sheffield and Huntsville, two Huntsville police officers (Sergeant Jason Ramsey and Officer Terry Lucas), and a person not previously named, Madison County Deputy Sheriff Eddie McDaniel.[5]  This court subsequently dismissed without prejudice the claims against the City of Sheffield, pursuant to the parties' joint stipulation of dismissal.[6]  This court also granted the motion to dismiss filed by Madison County Deputy Sheriff Eddie McDaniel, and dismissed with prejudice the state-law claims asserted against him for lack of subject matter jurisdiction, and without prejudice the federal claims asserted against him for failure to comply with federal pleading standards.[7]

---

[3] *See* doc. no. 1 (Complaint).

[4] The claims against Officer Thornberry were dismissed pursuant to plaintiffs' motion for dismissal, and the claims against Officers McCulley, McCarver, and McElyea were dismissed pursuant to the parties' joint stipulation of dismissal.  *See* doc. nos. 14 (Motion to Dismiss); doc. no. 16 (Order Dismissing Fewer than All Defendants); doc. no. 17 (Stipulation of Dismissal); doc. no. 18 (Order Entered February 21, 2012).

[5] *See* doc. no. 26 (First Amended Complaint).

[6] *See* doc. no. 27 (Stipulation of Dismissal); doc. no. 28 (Order Entered March 30, 2012).

[7] *See* doc. no. 35 (Motion to Dismiss) ;doc. no. 66 (Memorandum Opinion and Order), at 18.

Plaintiffs then filed a second amended complaint, asserting claims against the City of Huntsville, two of its police officers (Sergeant Jason Ramsey and Officer Terry Lucas), and Madison County Deputy Sheriff Eddie McDaniel.[8]  This court subsequently dismissed without prejudice the claims against Deputy McDaniel in accordance with plaintiffs' motion for dismissal.[9]

Thus, the only claims that remain pending are those based upon the United States Constitution and asserted through the remedial vehicle of 42 U.S.C. § 1983 against the City of Huntsville, Huntsville Police Sergeant Jason Ramsey, and Huntsville Police Officer Terry Lucas for an illegal search, unlawful arrest, and false imprisonment.[10]  In addition, the second amended complaint asserts supplemental state-law claims for false arrest, false imprisonment, malicious prosecution, and conversion against all three defendants,[11] and an "outrage" claim against the individual police officers.[12]

The action now is before the court on the defendants' motions for summary

---

[8] *See* doc. no. 72 (Second Amended Complaint).  Although the second amended complaint also includes the City of Sheffield in the caption of the case, that appears to be an error, because plaintiffs do not address Sheffield in their discussion of each of the defendants, *see id.* ¶¶ 5-9, and do not assert any claims against that municipal corporation.  *See id.* ¶¶ 32-54.

[9] *See* doc. no. 81 (Motion to Dismiss); doc. no. 83 (Order Entered February 19, 2013).

[10] Doc. no. 72 (Second Amended Complaint) ¶¶ 32-41.

[11] *Id.* ¶¶ 42-51.

[12] *Id.* ¶¶ 52-54.

3

judgment.[13]  Defendants also have moved to supplement their evidentiary submissions in support of summary judgment, and plaintiffs have moved to strike the affidavit of Madison County Assistant District Attorney James Tolleson.[14]  Upon consideration, this court will grant all motions for summary judgment, and deny the parties' remaining motions as moot.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

In making this determination, the court must review all evidence and

---

[13] *See* doc. no. 87 (Motion for Summary Judgment by the City of Huntsville); doc. no. 88 (Motion for Summary Judgment by Sergeant Ramsey); doc. no. 89 (Motion for Summary Judgment by Officer Lucas).

[14] *See* doc. no. 115 (Motion to Supplement Evidentiary Submissions); doc. no. 117 (Motion to Strike).

make all reasonable inferences in favor of the party opposing summary judgment.

[However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted) (alterations and emphasis suppled).

## II.  SUMMARY OF FACTS

The claims in this case were precipitated by the actions of a person who was not a party to the action:  Mr. Rowdy Meadows, who was staying with his family at the "Embassy Suites" hotel in Huntsville, Alabama on Saturday, March 20, 2010.[15] Mr. Meadows escorted his children and those of his sister to the hotel pool.[16]  While there, he saw an older boy dunking a younger boy.[17]  Something about the behavior of the older boy caused Meadows to become concerned for the safety of the younger one because, after Meadows witnessed the third dunk, he demanded that the older boy "stop!"[18]  The boys turned out to be Asher and Cameron Roddy, two of the plaintiffs'

---

[15] Doc. no. 91-13 (Deposition of Rowdy Meadows), at 28-29.

[16] *Id.*

[17] *Id.*

[18] *Id.*

three sons.[19]  The boys later said that Rowdy Meadows approached them, pointed at Asher (presumably, the older boy), and repeatedly screamed, "You!"[20]  Meadows demanded that both boys "get out of the pool."[21]  He "appeared very angry," and the boys were "afraid" of him.[22]  They returned to their hotel room and told their parents about the incident.[23]

The following morning, Dr. William Roddy approached Rowdy Meadows in the hotel restaurant.[24]  Dr. Roddy said that he did so only because he wanted to determine what had occurred at the pool, in order to decide whether to punish his sons for "roughhousing."[25]  Nevertheless, Meadows and Dr. Roddy later recounted very different versions of the ensuing conversation.

---

[19] *See* doc. no. 102-1 (Declaration of Asher Roddy); doc. no. 102-2 (Declaration of Cameron Roddy).

[20] Doc. no. 102-1 (Declaration of Asher Roddy) ¶ 4; doc. no. 102-2 (Declaration of Cameron Roddy) ¶ 4.

[21] Doc. no. 102-1 (Declaration of Asher Roddy) ¶ 4; doc. no. 102-2 (Declaration of Cameron Roddy) ¶ 4.

[22] Doc. no. 102-1 (Declaration of Asher Roddy) ¶¶ 4-4; doc. no. 102-2 (Declaration of Cameron Roddy) ¶¶ 4-4.  That testimony appears in two consecutive paragraphs, both designated as "4."

[23] Doc. no. 102-1 (Declaration of Asher Roddy) ¶¶ 4-4; doc. no. 102-2 (Declaration of Cameron Roddy) ¶¶ 4-4.  As noted in the preceding footnote, that testimony appears in two consecutive paragraphs, both designated as "4."

[24] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 53-54; doc. no. 91-13 (Deposition of Rowdy Meadows), at 46-48, 52, 60; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 1 [D7].

[25] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 43, 50, 52; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 43.

Dr. Roddy says that he merely asked Rowdy Meadows to tell him what had occurred at the hotel pool.[26]  Meadows, on the other hand, asserts that Dr. Roddy introduced himself as "*Judge* William Roddy."[27]  Meadows alleges that he explained to Dr. Roddy what had occurred with the two boys at the hotel pool.[28]  When Meadows attempted to leave, Dr. Roddy said, "I am not done with you . . . You are not going to leave."[29]  He then bumped into Meadows and flashed a gun from the left front pocket of his pants.[30]

Dr. Roddy denies introducing himself as "*Judge* William Roddy."[31]  He asserts that he merely asked Rowdy Meadows what had transpired at the pool,[32] in order "to judge" whether Meadows or his sons were telling the truth.[33]  Before Dr. Roddy understood Meadows's version of the incident, Meadows attempted to leave the area.[34]  Dr. Roddy alleges that he followed Meadows in order to give him a business

---

[26] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 57-58.

[27] Doc. no. 91-13 (Deposition of Rowdy Meadows), at 46-48, 52, 60; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 1 [D7].

[28] Doc. no. 91-13 (Deposition of Rowdy Meadows), at 47-48, 51-55.

[29] *Id.* at 61-62.

[30] *Id.* at 63-67, 103-04; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 1 [D7].

[31] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 58; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶ 2.

[32] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 57-58.

[33] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 57-58.

[34] *Id.* at 59-60.

card.[35]   When Dr. Roddy said "Let me give you this," and reached into his pants pocket to retrieve the business card, the handle of Dr. Roddy's handgun protruded from the pocket.[36] Dr. Roddy neither removed the gun from his pocket, nor aimed the gun at Meadows.[37]

Regardless of Dr. Roddy's subjective purpose when reaching into his pants pocket, his possession of a pistol was revealed to Rowdy Meadows; and, when Meadows saw the gun, he yelled "at the woman at the front desk to call the police . . . . [because a] man had pulled a gun on [him] in the lobby."[38] The "woman at the front desk" was Jolene Heckman, a manager at the Embassy Suites.[39] Dr. Roddy then approached Ms. Heckman and admitted to having a gun.[40] He asserts that he also told Ms. Heckman that he had a gun permit.[41]

Like Meadows, Hotel Manager Jolene Heckman alleges that Dr. Roddy

---

[35] *Id.*

[36] *Id.* at 63.

[37] *Id.*; doc. no. 91-13 (Deposition of Rowdy Meadows), at 66-67, 104.

[38] Doc. no. 91-13 (Deposition of Rowdy Meadows), at 64 (alterations supplied).

[39] *See* doc. no. 91-1 (Deposition of William Meyer Roddy), at 63, 65-66; doc. no. 91-13 (Deposition of Rowdy Meadows), at 64, 67-70, 73, 104; doc. no. 91-15 (Affidavit of Manager Heckman) ¶ 3; doc. no. 91-18 (Affidavit of Captain Dauro), Tab 1 (911 Call), at [D1] [Track one, 0:25-0:35]; *id.*, Tab 2 (Call for service); doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 1 [D7].

[40] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 65-66, 75; doc. no. 91-13 (Deposition of Rowdy Meadows), at 71-76; doc. no. 91-15 (Affidavit of Manager Heckman) ¶¶ 4, 6, 9.

[41] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 66, 275.

claimed to be a "Judge."[42]  Further, Ms. Heckman asserts that Dr. Roddy appeared to her to be "under the influence of drugs and/or [have] mental problems because he acted strangely, was fidgeting back and forth as Mr. Meadows was talking, and seemed out of it, not focused, and confused about the situation.  He also acted hyped-up and jumpy."[43]

Dr. Roddy denies telling Hotel Manager Jolene Heckman that he was a "Judge," but admits that he had ingested one 20 milligram Oxycontin pill earlier on the morning of his confrontation with Rowdy Meadows[44] — pain medication that is treated as a form of synthetic heroin.[45]  Even so, he denies that he was under the influence of drugs or any other intoxicants to the extent of impairment.[46]

In any event, a telephone call was placed to the "911" emergency response center by either Hotel Manager Jolene Heckman or Guest Service Agent Tristan Soto.[47]  Huntsville Police Officers David Anderson, Jason Brightwell, Bert Howle,

---

[42] Doc. no. 91-15 (Affidavit of Manager Heckman) ¶ 9.

[43] *Id.* ¶ 10 (alteration supplied).

[44] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 275; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶¶ 2-3.

[45] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 275; *see also* Alabama Code § 20-2-23 (1975) (Listing of Schedule I Controlled Substances); *id.* § 20-2-25 (1975) (Listing of Schedule II Controlled Substances).

[46] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 66, 275; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶¶ 2-3.

[47] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 65-66; doc. no. 91-13 (Deposition of Rowdy Meadows), at 70-71, 73-74, 75, 80; doc. no. 91-16 (Affidavit of Guest Service Agent Soto) ¶ 2; doc. no. 91-18 (Affidavit of Captain Dauro), Tab 1 (911 Call), at [D1] [Track one,

and Robert Nelson were dispatched to the hotel.[48]   Rowdy Meadows provided a description of the confrontation and of Dr. Roddy's appearance to Officer Nelson.[49] Neither Officer Nelson nor any other police officer questioned Meadows about drugs.[50]

After the "911" center was called, Dr. Roddy left the front desk area and returned to his hotel room on the tenth floor.[51]   He alleges that he did so because he wanted to show the officers his gun permit when they arrived on the scene.[52]   Dr. Roddy could not find the permit in his pants pockets, and assumed that he must have left it in the pocket of a lab coat in his hotel room.[53]   Rather than searching the lab coat for the permit, however, Dr. Roddy donned the coat.[54]

---

0:25-0:35, 1:10-1:23].

[48] Doc. no. 91-6 (Deposition of Officer Anderson), at 13-14, 22-23; doc. no. 91-7 (Deposition of Officer Howle), at 12; doc. no. 91-8 (Deposition of Officer Nelson), at 18; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 3; Ex. R, doc. no. 91-18 (Affidavit of Captain Dauro), Tab 1 (Radio Traffic ), at [D1] [Track two, 0:54-1:03]; *id.*, Tab 2 (Calls for Service); *id.*, Tab 3 (Event Chronology), at 1-2 [D3-D4].

[49] Doc. no. 91-8 (Deposition of Officer Nelson), at 20-26; doc. no. 91-13 (Deposition of Rowdy Meadows), at 84-87.

[50] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I & II), at 94; doc. no. 91-7 (Deposition of Officer Howle), at 13-14; doc. no. 91-8 (Deposition of Officer Nelson), at 19-26; doc. no. 91-13 (Deposition of Rowdy Meadows), at 86, 87, 89, 90-91, 94-95.

[51] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 66-67, 75-77; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 55-56; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 1 [D7].

[52] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 66, 76.

[53] *Id.* at 74.

[54] *Id.*

## A.   The Discovery of Dr. Roddy Wearing a White Lab Coat and Carrying a Gun, Various Controlled Substances, and $3,895 in Cash

Huntsville Police Officers David Anderson, Jason Brightwell, and Bert Howle (possibly accompanied by Huntsville Police Officer Robert Nelson and Hotel Manager Jolene Heckman) rode the elevator to the tenth floor, where they encountered Dr. Roddy in the hallway.[55]  Dr. Roddy was wearing jeans, a white T-shirt, a flannel shirt, and a white lab coat embroidered with the words "Dr. William Meyer Roddy, Int. Med/Psychiatry, Pain Treatment."[56]  Dr. Roddy asserts that he told one of the officers that he was a physician.[57]  Even so, Dr. Roddy does not remember precisely when he made that statement, and does not recall the name of the officer to whom he spoke.

Officer Brightwell conducted a pat-down search of Dr. Roddy and discovered a gun in the left front pocket of his pants.[58]  Officer Brightwell also found a hard, gray pill case with multiple prescription medications in the right front pocket of Dr.

---

[55] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 77-78; doc. no. 91-6 (Deposition of Officer Anderson), at 19-20, 26-27; doc. no. 91-7 (Deposition of Officer Howle), at 13-15, 19; doc. no. 91-8 (Deposition of Officer Nelson), at 19-21, 27, 32; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 4; doc. no. 91-15 (Affidavit of Manager Heckman) ¶ 13.

[56] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 77-79; doc. no. 91-30 (Photographs, Part I), at [D69].

[57] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 103.

[58] *Id.* at 80, 82-87; doc. no. 91-6 (Deposition of Officer Anderson), at 24-25; doc. no. 91-7 (Deposition of Officer Howle), at 16-17; doc. no. 91-8 (Deposition of Officer Nelson), at 31; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 4.

Roddy's pants.[59]  The officers allege that the case contained a total of 21 pills of various types:  *i.e.*, six Oxycontin pills; seven Adderall pills; three Focalin pills; one Mirtazapine pill; two Lexapro pills; two Atenolol pills; and three unidentified white pill fragments.[60]  Three of those medications are Schedule II controlled substances: *i.e.*, Oxycontin (the proprietary brand name for the drug that is generically known as Oxycodone); Adderall (the brand-name for Amphetamine); and Focalin (the brand-name for Methylphenidate).[61]

Plaintiffs argue that "[t]here is a question about the number and types of medications that were in the pill case because no inventory was made at the scene," but admit that the case contained "Oxycontin and ADHD medication":  *i.e.* medications for Attention Deficit Hyperactivity Disorder ("ADHD"), presumably,

---

[59] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 83-84, 87, 163; doc. no. 91-6 (Deposition of Officer Anderson), at 27-28; doc. no. 91-7 (Deposition of Officer Howle), at 17; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 4; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2 [D8]; doc. no. 91-32 (Photographs, Part III), at[D79]; doc. no. 91-40 (Photographs, Part XI), at [D117].

[60] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 83-84, 87, 163; doc. no. 91-6 (Deposition of Officer Anderson), at 27-28; doc. no. 91-7 (Deposition of Officer Howle), at 17; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 4; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2 [D8]; doc. no. 91-32 (Photographs, Part III), at[D79]; doc. no. 91-40 (Photographs, Part XI), at [D117].

[61] *See* 21 C.F.R. § 1308.12(b)(1)(xiii) [Oxycodone], (d)(1) [Amphetamine], (d)(4) [Methylphenidate]; Alabama Department of Public Health, Controlled Substances List (Jan. 16, 2013), www.adph.org/publications/assets/ControlledSubstancesList.pdf; Ala. Code § 20-2-20(a) (1975); doc. no. 91-1 (Deposition of William Meyer Roddy), at 151.

Adderall, Focalin, Mirtazapine, Lexapro, and Atenolol.[62]  Regardless, Dr. Roddy *did*

*not dispute* the allegations regarding the "number and types" of pills in the case at his

deposition, but, instead, testified as follows:

> Q.      It's my understanding that from your person a small gray plastic
>          container was seized, and it had approximately 21 pills in it,
>          which included six Oxycontin, seven Adderall, two Focalin, one
>          Mirtazapine, two Lexapro, two Atenolol, and three white
>          fragments of white pills that could not be identified. *Do you have
>          any reason to dispute that?*
>
> A.      It don't remember that many, but that — *I'll go with that.*[63]

Dr. Roddy alleges that he discussed the prescriptions for the medications

contained in the pill case with Officer Brightwell.  Specifically, Dr. Roddy stated,

"There's [sic] prescriptions for those medications."[64]   When asked by Officer

Brightwell, "Where are they?," Dr. Roddy answered, "They're in my room."[65]

In addition to the gun and pills, the officers found crumpled, wadded-up cash

in various denominations aggregating the amount of $3,895 in the pockets of Dr.

---

[62] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 7 (citing doc. no. 91-5 (Deposition of Officer McDaniel), at 24).

[63] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 163 (emphasis supplied).

[64] *Id.* at 89.

[65] *Id.*

Roddy's pants.[66]  The officers assert that the cash was also "dirty,"[67] but plaintiffs

dispute that portion of the officers' allegations.[68]

The officers also found a bottle of injectable liquid in one of Dr. Roddy's

pockets.[69]  The officers assert that the bottle's label was illegible,[70] but plaintiffs

argue that "the label could be read, at least in part."[71]  Upon review, the cited

testimony cited by plaintiffs does not support their contention that the bottle's label

was partially legible.  Dr. Roddy testified as follows:

> Q.    It's my understanding also, from your person, a brown bottle *with an illegible label on it*, and that was the injectable liquid.  *Do you have any reason to dispute that?*
>
> A.    *No.*[72]

---

[66] *Id.* at 87; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 93; doc. no. 91-6 (Deposition of Officer Anderson), at 28-30; doc. no. 91-7 (Deposition of Officer Howle), at 17; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2 [D8].

[67] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 87; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 93; doc. no. 91-6 (Deposition of Officer Anderson), at 28-30; doc. no. 91-7 (Deposition of Officer Howle), at 17; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2 [D8].

[68] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 7 (citing doc. no. 91-1 (Deposition of William Meyer Roddy), at 104; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2-3 [D8]; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶ 4).

[69] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 87, 163-64; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2-3 [D8].

[70] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 87, 163-64; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2-3 [D8].

[71] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 7 (citing doc. no. 91-1 (Deposition of William Meyer Roddy), at 83, 163-64).

[72] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 163-64 (emphasis supplied).

The injectable liquid was later identified as Testosterone, a Schedule III controlled substance.[73]

## B.    The Arrest of Dr. Roddy for Possession of Controlled Substances

Sergeant Jason Ramsey was dispatched to the Embassy Suites for additional investigation on behalf of the Huntsville-Madison County Strategic Counterdrug Team ("STAC"):  a multi-jurisdictional law-enforcement task force charged with investigating drug crimes.[74]  (At the time of the events described here, Jason Ramsey was a Huntsville Police Officer assigned to the STAC unit, but he later was promoted to the rank of Sergeant and left the task force.[75])

When Sergeant Ramsey arrived at the hotel, he was briefed by the other officers on the scene about the confrontation between Dr. Roddy and Rowdy Meadows, and the gun, pills, cash, and bottle of (then unidentified) injectable liquid found on Dr. Rowdy's person.[76]  There is no evidence that Sergeant Ramsey was told

---

[73] *Id.* at 87, 163-64; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2-3 [D8].

[74] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 42, 45-46; doc. no. 91-6 (Deposition of Officer Anderson), at 29-30; doc. no. 91-7 (Deposition of Officer Howle), at 21; doc. no. 91-9 (Deposition of Officer McCarver), at 14-15; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 3; Ex. R, doc. no. 91-18 (Affidavit of Captain Dauro), Tab 1 (Radio Traffic ), at [D1] [Track two, 6:44-6:50].

[75] Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 6 n.4; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 12, 23.

[76] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I-II), at 51-52, 58-59, 62-63, 94-98; doc. no. 91-7 (Deposition of Officer Howle), at 25; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 5 ; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No.

that Dr. Roddy had claimed to be a physician, and to have prescriptions for the pills in the case found in his pants pocket.[77]

Sergeant Ramsey alleges that Dr. Roddy stated that the vial of liquid was Testosterone to be injected by his personal physician, and that his physician had asked him to keep the bottle to prevent loss.[78]  Plaintiffs deny that Dr. Roddy gave the officers "any suspicious information concerning the injectable testosterone,"[79] but do not specify what, if anything, Dr. Roddy *did say* about the bottle.

Sergeant Ramsey suspected, like Hotel Manager Jolene Heckman, that Dr. Roddy was under the influence of drugs because he did not appear to be "engaged" in the situation, and had messy hair and a slouched and unkempt appearance.[80]  After Sergeant Ramsey read Dr. Roddy his Miranda rights and warnings, Dr. Roddy declined to speak further.[81]

Dr. Roddy alleges that, at an unspecified point in time, he told Sergeant

---

V10-244), at 2 [D8].

[77] *See* doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 58-60, 72 (describing the content of Sergeant Ramsey's briefing).

[78] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 2 [D8].

[79] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 8.

[80] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 139, 237-38; *see also* doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 6.

[81] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 98-99; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 71-72; doc. no. 91-14 (Declaration of Officer Brightwell) ¶ 6.

Ramsey that he was a physician.[82]  Sergeant Ramsey denies that Dr. Roddy told him

that he was a physician at any time before he was read his Miranda rights.[83]  In any

event, Sergeant Ramsey arrested Dr. Roddy for possession of controlled substances.[84]

## C.   The Search Warrant for Plaintiffs' Hotel Room

Sergeant Ramsey then departed the Embassy Suites hotel and returned to his

office for the purpose of drafting a search warrant and supporting affidavit for the

Roddys' hotel room.[85]  The section of the affidavit that explained Sergeant Ramsey's

reasons for suspecting plaintiffs of using their hotel room as a "base of operations"

for selling controlled substances reads as follows:

> I responded to assist Huntsville Police Patrol at the Embassy
> Suites.  They notified me that they had responded to a call of an armed
> subject who pulled a gun on another guest of the hotel.  The description
> was of a white male wearing a green plaid shirt.  Officers went to the
> 10th floor and saw a white male (William Roddy) wearing a green plaid
> shirt go into Room 1020 and when he came out he was wearing a white
> doctor coat over his green plaid shirt.  They patted him down for officer
> safety and found a loaded handgun in his left front pant pocket.  They
> also located approximately $3900 in cash in both pockets mostly in $100
> bills.  Inside his right front pant pocket was a small plastic container that
> had 5 different pills in it.  I was able to identify four of them through

---

[82] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 103.

[83] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 72.

[84] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 89-90, 98-99; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 62-65, 69-73.

[85] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 36-37; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 91-93, 98-99, 101-04; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

Poison Control as controlled substances such as generic Aderol, Oxycontin 20 mg, and Focalin 15 & 20 mg.  I read William Roddy his Miranda rights and he stated he wished to have [a] lawyer present.  I placed him under arrest at that time and he stated he felt that he was going to be sick and kept trying to have a conversation which I told him I could not talk to him anymore.

Before being Mirandized he stated he did not know it was illegal to have prescription pills that w[]ere not in the correctly labeled bottles and that they belong to him and his family and were a two day supp[l]y. Finding it unusual that a doctor would not know that and that he had a large amount of cash (a lot of wadded up $100 bills in both his pockets) I believe based on the totality of the circumstances that he is using Room 1020 located at the Embassy Suites as his temporary base of operation in the illegal s[a]l[e] of controlled substances namely pills.[86]

Warrant Magistrate Scott Rogers signed the search warrant for the hotel room.[87]

Huntsville Police Officer Terry Lucas and Madison County Deputy Sheriff Eddie McDaniel (both of whom served on the STAC Team) assisted Sergeant Ramsey in executing the search warrant.[88]  Officer Lucas was briefed on the fact that the Huntsville Police received a 911 call alleging that Dr. Roddy pulled a gun on an Embassy Suites guest, and that officers found Dr. Roddy with a gun, pills, and a large amount of wadded-up cash in different denominations on his person.[89]

---

[86] Doc. no. 91-28 (Search Warrant Affidavit), at 2 [D20] (capitalization omitted) (alterations supplied).  The court has included the alterations to correct spelling and grammatical errors.

[87] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 103-06; doc. no. 91-27 (Search Warrant); doc. no. 91-28 (Search Warrant Affidavit).

[88] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 109-11; doc. no. 91-4 (Deposition of Officer Lucas), at 25; doc. no. 91-5 (Deposition of Deputy McDaniel), at 16-17.

[89] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 146; Ex. D, doc. no. 91-4 (Deposition of Officer Lucas), at 29, 34-35.

Sergeant Ramsey, Officer Lucas, and Deputy McDaniel then performed a search of plaintiffs' hotel room.[90]  Specifically, Sergeant Ramsey and Officer Lucas searched the room, while Deputy McDaniel took photographs and wrote down information on the "search warrant return," a written inventory of the items seized in the course of the search.[91]  Officer Lucas was not otherwise involved in the criminal case against plaintiffs.[92]

The officers found what appeared to be a permit to carry a concealed weapon on a table in the hotel room.[93]  Sergeant Ramsey asserts that the document was in such poor shape he could not verify its validity.[94]  Further, the officers found a briefcase containing hundreds of pills and documents.  The officers later inventoried those items to include the following:

a.    Labeled prescription bottle for 90 count 40 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on December 24, 2008, and

---

[90] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 144-47; doc. no. 91-4 (Deposition of Officer Lucas), at 37-38; doc. no. 91-5 (Deposition of Deputy McDaniel), at 27-28; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[91] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 144-47; doc. no. 91-4 (Deposition of Officer Lucas), at 37-38; doc. no. 91-5 (Deposition of Deputy McDaniel), at 27-28, 31; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9]; doc. nos. 91-30-40 (Photographs), at [D67-D114].

[92] Doc. no. 91-4 (Deposition of Officer Lucas), at 67.

[93] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 61-62.

[94] *Id.*

19

containing **74 Oxycontin pills**;[95]

b.   Labeled prescription bottle for 90 count 20 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on August 21, 2009, and containing **60 Oxycontin pills**;[96]

c.   Labeled prescription bottle for 90 count 40 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on November 19, 2009, and containing **19 Oxycontin pills**;[97]

d.   Labeled prescription bottle for 90 count 20 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on December 16, 2009, and containing no pills;[98]

e.   Labeled prescription bottle for 90 count 40 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on January 22, 2010, and containing **50 Oxycontin pills**;[99]

f.   Labeled prescription bottle for 90 count 20 milligram Oxycontin pills issued "Dr. *Mike* Roddy" on January 22, 2010, and containing **53 Oxycontin pills**;[100]

g.   Labeled prescription bottle for 90 count 40 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on February 17, 2010, and containing **15 Oxycontin pills**;[101]

---

[95] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[96] *Id.*

[97] *Id.*

[98] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 166; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[99] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[100] *Id.*

[101] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 167; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

h.   Labeled prescription bottle for 90 count 20 milligram Oxycontin pills issued to "Dr. *Mike* Roddy" on February 17, 2010, and containing **59 Oxycontin pills**;[102]

i.   Labeled prescription bottle for 60 count 30 milligram Oxycodone pills issued to "Dr. *Mike* Roddy" on January 22, 2010, and containing **14 Oxycodone pills**;[103]

j.   Labeled prescription bottle for 60 count 30 milligram Oxycodone pills issued to "Dr. *Mike* Roddy" on February 17, 2010, and containing no pills;[104]

k.   Unlabeled bottle containing numerous unknown white pills;[105]

l.   Melatonin bottle containing **28 Divalproex pills** and 52 unknown white pills;[106]

m.   Unlabeled bottle containing **20 Focalin pills and 39 Alprazolam pills**;[107]

n.   Labeled prescription bottle issued to "A. Roddy," and containing **19 Focalin pills and 17 Didanosine pills**;[108]

---

[102] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[103] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 172; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[104] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 172; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[105] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 173; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[106] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 173; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[107] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[108] *Id.*

o.  Unlabeled bottle containing **34 Viagra pills and 3 Carisoprodol pills**;[109]

p.  Labeled prescription bottle issued to "*C.* Roddy," and containing **22 Focalin pills**;[110]

q.  Labeled prescription bottle for Methylphenidate issued to "Dr. *Mike* Roddy," and containing **20 Oxycodone pills, 1 Focalin pill, 2 Methylphenidate pills, and 1 Meperidine pill**;[111]

r.  Unlabeled bottle containing **5 Clonazepam pills and 2 Dexmethylphenidate Hydrochloride (Focalin) pills**;[112]

s.  Labeled prescription bottle for Methylphenidate issued to "Dr. *Mike* Roddy," and containing **42 Valium pills and 1 Pristia pill**;[113]

t.  Unlabeled bottle containing numerous unknown white pills;[114]

u.  Unlabeled bottle containing **1 Viagra pill and 19 Dexmethylphenidate Hydrochloride (Focalin) pills**;[115]

v.  Unlabeled bottle containing **3 Alprazolam pills,** 3 unknown partial bars, **1 Lunesta pill, and 21 Clonazepam pills**;[116]

---

[109] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 175; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[110] *Id.*

[111] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[112] *Id.*

[113] *Id.*

[114] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 183-84; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[115] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[116] *Id.*

w.     Unlabeled bottled containing **27 Doxycycline Hyclate pills**;[117]

x.     Unlabeled bottled containing **6 Ambien pills**;[118]

y.     **$900 in cash**;[119] and

z.     **Various documents**, many bearing the name "*William* Roddy," and some bearing the name "*Mike* Roddy."[120]

Further, the officers allege that they found a yellow purse containing the following:

a.     Ibuprofen bottle containing **99 Ibuprofen pills, 15 Metformin hydrochloride pills,** 20 unknown white pills, **5 Clonzepam pills, 3 Mirtazapine pills, 1 Alprazolam pill, 1 Acetaminophen hydrocodone pill**, and 1 unknown orange pill with blue dots;[121] and

b.     Loose pills, including **1 Clonazepam pill, 3 Mirtazapine pills, 15 Adderall pills, 3 Metformin hydrochloride pills, 1 Alprazolam pill,** 2 unknown pink pill fragments, and 10 unknown white pills.[122]

---

[117] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 186; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[118] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[119] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 287-88; doc. no. 91-4 (Deposition of Officer Lucas), at 62-63; doc. no. 91-29 (Search Warrant Return), at 2 [D28].

[120] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 234-35; doc. no. 91-4 (Deposition of Officer Lucas), at 43; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10]; doc. no. 107 (Stipulation), Tab I.

[121] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 108-13; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10].

[122] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 108-13; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10].

The officers assert that they found more pill bottles throughout the hotel room, including the following:

a.  Labeled prescription bottle for Prednisone issued to "Dr. *Mike* Roddy," and containing **49 Prednisone pills**;[123]

b.  Unlabeled bottle containing **19 Depakote pills, 2 Fluoxetine pills, and 4 Trazodone pills**;[124] and

c.  Ibuprofen bottle containing **Ibuprofen pills**.[125]

In total, the officers allege that they found at least **987 pills** in plaintiffs' hotel room, **over 300 of which were Oxycontin or Oxycodone pills** (Schedule II controlled substances).[126]  Sergeant Ramsey concluded at some point during the search that, due to the large number of pills found, it would be unreasonable to hold the hotel room and remain there to count all of them.[127]

Thus, Deputy McDaniel documented the pill *bottles* found on the search

---

[123] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 188; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[124] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 189-91; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[125] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 191; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9].

[126] *See supra*; doc. no. 91-39 (Photographs, Part X), at [D115]; doc. no. 91-40 (Photographs, Part XI), at [D119].

[127] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 163-65, 169; doc. no. 91-4 (Deposition of Officer Lucas), at 46; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 3 [D9]).

warrant return, and left a copy of that document in the hotel room.[128]  Sergeant Ramsey completed a more detailed inventory at the STAC office, which included the exact *number* and *type* of pills found in the hotel room.[129]  That process took Sergeant Ramsey four days to complete.[130]

With regard to the briefcase, plaintiffs admit "that the *prescription bottles listed were in the briefcase*."[131]  Plaintiffs deny that the briefcase contained any *unlabeled bottles of prescription medication*, and deny that it contained *labeled bottles with multiple types of prescription medication*.[132]  Plaintiffs dispute the "*actual quantity and type of medications* in some of the pill bottles,"[133] but do not object to the descriptions of the contents of any specific bottles, and do not offer an alternative description of the medication found in those bottles.

With regard to the purse, plaintiffs admit that "it contained an Ibuprofen bottle

---

[128] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 202; doc. no. 91-5 (Deposition of Deputy McDaniel), at 30, 38.

[129] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 163-65, 169; doc. no. 91-4 (Deposition of Officer Lucas), at 46; doc. no. 91-5 (Deposition of Deputy McDaniel), at 30, 39; doc. no. 91-29 (Search Warrant Return).

[130] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 215; doc. no. 91-10 (Deposition of Officer Sedham), at 59-60; 92; doc. no. 91-7 (Deposition of Officer Howle), at 46.

[131] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 10 (emphasis supplied).

[132] *Id.* (citing doc. no. 91-1 (Deposition of William Meyer Roddy), at 173-74, 185).

[133] *Id.* (emphasis supplied).

25

containing some prescription medications."[134]  In other words, plaintiffs admit that

the purse contained a *non-prescription bottle containing multiple types of*

*prescription medications*.  Plaintiffs deny "that there were any loose pills unless they

were spilled after the bottle was opened by the officers."[135]  Thus, plaintiffs do not

deny that the listed quantities and types of pills actually were in the purse, and dispute

only their designation as "loose pills."

    With regard to the pill bottles found throughout the hotel room, plaintiffs admit

the officers' descriptions, and deny only "that prescription medications listed in 36

b [*i.e.*, the 19 Depakote pills, 2 Fluoxetine pills, and 4 Trazodone pills] would have

been mixed."[136]

## D.    The Arrest of Mrs. Roddy

    At some point during the search, Sergeant Ramsey brought Dr. Roddy's wife,

plaintiff Wendy Roddy, into the hotel room.[137]  Mrs. Roddy admitted to owning the

purse, and the pills found within it.[138]  Sergeant Ramsey asserts that Mrs. Roddy could

---

[134] *Id.* at 11.

[135] *Id.* at 11 (citing doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 115, 117).

[136] *Id.* at 11 (alteration supplied) (citing doc. no. 91-1 (Deposition of William Meyer Roddy), at 176, 185).

[137] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 95-96; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 189-91, 193.

[138] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 106-07; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 191, 197.

not account for an Alprazolam pill found in her purse,[139] but Mrs. Roddy alleges that she told Sergeant Ramsey that the pill had been prescribed for her.[140]

Defendants argue that "[t]here were no prescription bottles in the hotel room or yellow purse to indicate the pills found in Mrs. Roddy's yellow purse were possessed legally."[141]   Plaintiffs respond that "[l]abeled bottles for *Adderall* and *Focalin* were in the briefcase and on the bedside table."[142]   Notably, however, that response does not address evidence of plaintiffs' prescription for *Alprazolam*.

In addition to the contents of the purse, Sergeant Ramsey questioned Mrs. Roddy about the contents of Dr. Roddy's pill case and the Roddy family's hotel room. Mrs. Roddy asserts that she told Sergeant Ramsey that the Roddys had prescriptions for all of the medications in their possession,[143] but Sergeant Ramsey denies that allegation.[144]

---

[139] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 197; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10]).

[140] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 111, 124, 153; doc. no. 102-4 (Declaration of Wendy Sue Roddy) ¶ 2.

[141] Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 20 (alteration supplied) (citing doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 108-09, 120-22, 152-53; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10]).

[142] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 12 (emphasis and alteration supplied) (citing doc. no. 91-1 (Deposition of William Meyer Roddy), at 284; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 122-24; doc. no. 91-4 (Deposition of Officer Lucas), at 53; doc. no. 91-29 (Search Warrant Return)).

[143] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 102, 184.

[144] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 226-27.

Further, as noted above, Dr. Roddy's full name is *William Meyer* Roddy.  Dr. Roddy's driver's license, and his white lab coat, both stated his name as "*William Meyer* Roddy."[145]  Some of the pill bottles and documents found in the briefcase bore the name "*William* Roddy."[146]  Even so, other pill bottles and documents found in the briefcase and elsewhere throughout the hotel room bore the name "*Mike* Roddy."[147]

Mrs. Roddy alleges that she told Sergeant Ramsey that Dr. Roddy was also known as "Mike."[148]  Mrs. Roddy asserts that she then offered Sergeant Ramsey the cell phone numbers of a physician and pharmacist who could verify Dr. Roddy's identity.[149]  Mrs. Roddy also alleges that she offered to allow Sergeant Ramsey to access plaintiffs' automobile, which contained documentation showing that "William Meyer Roddy" and "Mike Roddy" are the same person, but that Sergeant Ramsey declined to do so.[150]  Sergeant Ramsey denies that Mrs. Roddy offered him witness telephone numbers, or voluntary access to the plaintiffs' auto.[151]

Sergeant Ramsey suspected that Mrs. Roddy was under the influence of drugs

---

[145] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 9-10, 77-79; doc. no. 91-30 (Photographs, Part I), at [D69]; doc. no. 91-33 (Photographs, Part IV), at [D84].

[146] Doc. no. 107 (Stipulation), Tab I; doc. no. 108-1 (Stipulation), Tab II.

[147] See the inventory in Part II(C), *supra*.

[148] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 102.

[149] *Id.* at 102, 189.

[150] *Id.* at 102.

[151] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 195-200, 241-43.

because she was not paying attention to or participating in the conversation, and was laughing and smiling.[152]  Mrs. Roddy denies being under the influence of drugs or any other intoxicants.[153]  In any event, Sergeant Ramsey read Mrs. Roddy her Miranda rights.[154]  Sergeant Ramsey asserts that Mrs. Roddy then declined to speak further,[155] but she alleges that she subsequently had a lengthy discussion with Sergeant Ramsey.[156]  Sergeant Ramsey placed Mrs. Roddy under arrest and ordered both plaintiffs to be transported to jail.[157]

Dr. Roddy asserts that, while in jail, he told Sergeant Ramsey that he is also known as "Mike," and that "William Meyer Roddy" and "Mike Roddy" are the same person.[158]  Dr. Roddy alleges that he then asked Sergeant Ramsey to call his physician and pharmacist to confirm his prescriptions and identity.[159]  According to Dr. Roddy,

---

[152] *Id.* at 235-38.

[153] Doc. no. 102-4 (Declaration of Wendy Sue Roddy) ¶ 3.

[154] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 118-19; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 197.

[155] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 118-19; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 197.

[156] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 100, 119.

[157] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 101; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 118-19, 135; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 197-200, 233-34; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10].

[158] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 107.

[159] *Id.* at 108.

Sergeant Ramsey "didn't say anything" in response to his offers.[160] Sergeant Ramsey denies that Dr. Roddy provided the names of his physician and pharmacist, and testified that he and Dr. Roddy only discussed one subject at the jail: *i.e.*, the amount of Dr. Roddy's bail.[161]

## E.    Sergeant Ramsey Speaks with Captain Randy Butler Regarding Plaintiffs

On the day of plaintiffs' arrests, Sergeant Ramsey contacted Sheffield Police Captain Randy Butler as a professional courtesy, to inform him about the situation unfolding at the Embassy Suites, and to ask whether he knew anything about plaintiffs.[162]   Sergeant Ramsey and Captain Butler had several telephone conversations during the course of the investigation.[163]

Sergeant Ramsey told Captain Butler "that Wendy Roddy stated that there was a large amount of cash in a safe from sales, along with a large amount of Medications," at plaintiffs' residence in Sheffield, Alabama.[164]  As a result, Captain Butler decided to seek a search warrant for plaintiffs' residence.[165]  Sergeant Ramsey did not request that Captain Butler seek a search warrant, and was not otherwise

---

[160] *Id.* at 102.

[161] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 226-27, 241-44.

[162] *Id.* at 293-95; doc. no. 91-12 (Deposition of Captain Butler), at 23-26.

[163] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 293-301; doc. no. 91-12 (Deposition of Captain Butler), at 23-26, 42-43.

[164] Doc. no. 91-12 (Deposition of Captain Butler), at 90.

[165] *Id.* at 41-43, 86-91, 105.

involved in obtaining the search warrant for plaintiffs' residence.[166]

## F.   Sergeant Ramsey Receives Communications from the Alabama Board of Medical Examiners

An employee of the Alabama Board of Medical Examiners named Jeff Grimsley informed Sergeant Ramsey during the week of March 22, 2010 that Dr. *William* Roddy was also known as "Dr. *Mike* Roddy."[167]  Grimsley also mailed copies of the patient prescription summaries for "William Meyer Roddy," "A. Roddy," and "C. Roddy" to Sergeant Ramsey on March 25, 2010.[168]

The patient prescription summary for "William Meyer Roddy" shows prescriptions for Oxycontin, Oxycodone, Testosterone, Methylphenidate, and several other medications that were filled at the Shoals Pharmacy in Tuscumbia, Alabama between January 1, 2009 and March 25, 2010.[169]  The prescription summary does not show any prescriptions filled under the name "Mike Roddy."[170]  Even so, the information regarding the Oxycontin and Oxycodone prescriptions on the prescription

---

[166] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 293, 301; doc. no. 91-12 (Deposition of Captain Butler), at 101, 104-05.

[167] Doc. no. 103-1 (Declaration of Alabama Board of Medical Examiners Employee Grimsley) ¶ 3.

[168] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 315-16; doc. no. 91-41 (Facsimile from Alabama Board of Medical Examiners Employee Grimsley).

[169] Doc. no. 91-41 (Facsimile from Alabama Board of Medical Examiners Employee Grimsley), at 2-6 [D41-D45].

[170] *Id.*

31

summary for "William Meyer Roddy" matches the information regarding those prescriptions on the pill bottles for "Dr. Mike Roddy" found in Dr. Roddy's briefcase.[171]  That information includes the prescription date, prescribing physician, dispensing pharmacy, prescription number, quantity, and dosage.[172]

Additionally, the information on the patient summaries for "A. Roddy" and "C. Roddy" matches the information on the pill bottles for two of plaintiffs' sons, Asher Roddy and Cameron Roddy.[173]

## G.   Plaintiffs are Each Charged with Trafficking in Illegal Drugs

Plaintiffs were charged with "trafficking in illegal drugs" in violation of Alabama Code § 13A-12-231(3), because officers discovered more than four grams of Oxycontin pills in their hotel room.[174]  Even so, the warrants issued for plaintiffs' arrests and executed by Sergeant Ramsey on March 26, 2010 listed their charges as

---

[171] *Id.* at 2-11; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶ 6; doc. no. 107 (Stipulation), Tab I; doc. no. 108-1 (Stipulation), Tab II.

[172] *Id.* at 2-11; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶ 6; doc. no. 107 (Stipulation), Tab I; doc. no. 108-1 (Stipulation), Tab II.

[173] *Id.* at 2-11; doc. no. 102-3 (Declaration of William Meyer Roddy) ¶ 6; doc. no. 107 (Stipulation), Tab I; doc. no. 108-1 (Stipulation), Tab II.

[174] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 299; doc. no. 91-4 (Deposition of Officer Lucas), at 91-92; doc. no. 91-22 (Affidavit of Captain Malone), Tab 1 (Arrest Report for William Roddy), at [D34]; *id.*, Tab 2 (Arrest Report for Wendy Roddy), at [D35]; doc. no. 91-25 (Arrest Warrant for William Roddy), at [D38]; doc. no. 91-26 (Arrest Warrant for Wendy Roddy), at [D39]; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 1 [D7]; *id.* at 1 [D12].

"Trafficking – Heroin."[175] That is incongruous, because it is undisputed that plaintiffs did not possess heroin in any amount.[176] As previously noted, however, Oxycontin is treated as a form of synthetic heroin.[177]

## H.   Madison County Assistant District Attorney James Tolleson Voluntarily Dismisses the Criminal Charges Against Both Plaintiffs

Madison County Assistant District Attorney James Tolleson filed motions to *nolle prosse* the criminal charges against plaintiffs on January 19, 2011, and the motions were granted on January 21, 2011.[178] The decision to prosecute or dismiss the charges against plaintiffs rested with Tolleson, not the Huntsville Police Department or its officers.[179]

## I.   Plaintiffs Accuse Sergeant Ramsey of Stealing $275 in Seized Cash

At some point after their criminal charges were dismissed, plaintiffs attempted to retrieve the evidence seized during the investigation from the Madison County Courthouse.[180] The Huntsville Police Department's Evidence/Property Custody

---

[175] Doc. no. 108-2 (Stipulation), Tab III.

[176] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 285; doc. no. 91-4 (Deposition of Officer Lucas), at 83; doc. no. 91-5 (Deposition of Deputy McDaniel), at 44.

[177] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 275; *see also* Alabama Code § 20-2-23 (1975) (Listing of Schedule I Controlled Substances); *id.* § 20-2-25 (1975) (Listing of Schedule II Controlled Substances).

[178] Doc. no. 91-17 (Affidavit of Assistant District Attorney Tolleson), Tab I (Case Action Summary Sheets with Court Orders); *id.*, Tab II (Motions to *Nolle Prosse*), at [D3941-D3942].

[179] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), 316-17, 329-31.

[180] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 108; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 147-48; doc. no. 91-22 (Affidavit of Captain Malone), Tab 6

Documents reflect that Sergeant Ramsey ordered the numerous pills seized to be destroyed.[181]

Even so, the Roddys successfully retrieved items seized from Dr. Roddy's person (a gun, driver's license, hotel key, pill case, bottle of liquid, documents, and $3,895 in cash),[182] and items seized later in the investigation (a briefcase, pill bottles, documents, and $1,025 in cash).[183] The $1,025 in cash allegedly was the sum of $900 seized from Dr. Roddy's briefcase, and $125 seized from Mrs. Roddy's purse.[184]

Plaintiffs informed Sergeant Ramsey and others who were present on the date of retrieving their personal property from the police department that Mrs. Roddy had seen Sergeant Ramsey remove an *additional* $200 from her purse, *and* $75 from a son's wallet, and place the money into his pocket.[185]  Dr. Roddy asked Sergeant Ramsey what he had done with the allegedly missing money, and Sergeant Ramsey denied taking it.[186]  Plaintiffs assert that $275 was not returned.[187]

---

(Incident/Investigation Report), at [D130].

[181] Doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 3 (Evidnce/Property Custody Documents), at 18-22 [D29-D33].

[182] *Id.* at 21 [D32].

[183] *Id.* at 18-20, 22 [D29-D30, D33].

[184] Doc. no. 91-20 (Affidavit of Sergeant Stedham), Tab I (Internal Affairs File for Case No. CC2011-13).

[185] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 177-178, 180, 188.

[186] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 110, 114.

[187] *Id.*

34

As a result, plaintiffs filed an incident report and complaint with the Internal Affairs Division of the Huntsville Police Department.[188]   Because plaintiffs' complaint alleged criminal misconduct, the Major Crimes Unit of the Huntsville Police Department launched a parallel criminal investigation into the matter.[189]   The Major Crimes Unit was the first to complete its investigation.[190]   Its report, authored by Captain JesHenry Malone, stated:

> It is my opinion that although STAC Agents could have been more thorough when documenting evidence seized, I can find no evidence or provable fact to support the allegation that a criminal act occurred.  An Administrative investigation is currently being conducted by Internal Affairs, and pending any evidence that may arise from  that investigation indicating criminal intent or action on the part of Officer Ramsey, I see no further avenues to pursue in this case.[191]

Captain Malone's report also stated:

> Based on the facts and circumstances of this case, there is no evidence to validate or support the claim of William Roddy and his wife Wendy Sue Roddy.  In fact, the evidence that has been produced

---

[188] *Id.* at 126-28; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at. 148; doc. no. 91-10 (Deposition of Sergeant Stedham), at 31-37, 39-43; doc. no. 91-20 (Affidavit of Sergeant Stedham), Tab I (Internal Affairs File for Case No. CC2011-13); doc. no. 91-22 (Affidavit of Captain Malone), Tab VI (Incident/Investigation Report), at [D123-35].

[189] Doc. no. 91-10 (Deposition of Sergeant Stedham), at 22-23, 28-29, 44-45; doc. no. 91-22 (Affidavit of Captain Malone), Tab VI (Incident/Investigation Report), at [D123-35].

[190] *See* Doc. no. 91-20 (Affidavit of Sergeant Stedham), Tab I (Internal Affairs File for Case No. CC2011-13), at [D3729] (referring to the investigation previously concluded by the Major Crimes Unit); doc. no. 91-22 (Affidavit of Captain Malone), Tab VI (Incident/Investigation Report), at [D131, D135] (referring to the then ongoing investigation by the Internal Affairs Division).

[191] Doc. no. 91-22 (Affidavit of Captain Malone), Tab VI (Incident/Investigation Report), at [D131].

supports the sequence of events told by Inv. [*i.e.*, Investigator] Ramsey. The money that Officers seized was listed on the inventory sheets and returned to them upon the dismissal of their case.

      This case is Unfounded as there is no evidence to support that a crime actually occurred.  The Officers in this case were acting under the confines of their duties and under the guidelines of the criminal code and the search warrant.[192]

Likewise, the Internal Affairs report stated that "Internal Affairs can find no HPD Written Directive or City Policy violated by any HPD employee.  Huntsville Police Major Crimes investigated the case and found that there was no criminal intent and no warrants will be obtained."[193]  The Huntsville Police Department ultimately closed both investigations without taking action against any officer.[194]

## III.  PLAINTIFFS' § 1983 CLAIMS

Plaintiffs' second amended complaint asserts claims under the United States Constitution and 42 U.S.C. § 1983 for an illegal search, unlawful seizure, arrest, and imprisonment against the City of Huntsville, Alabama and the two remaining individual defendants:  *i.e.*, Huntsville Police Sergeant Jason Ramsey and Huntsville Police Officer Terry Lucas.[195]

---

[192] *Id.* at [D135] (alteration supplied).

[193] Doc. no. 91-20 (Affidavit of Sergeant Stedham), Tab I (Internal Affairs File for Case No. CC2011-13), at [D3729].

[194] *Id.*; doc. no. 91-22 (Affidavit of Captain Malone), Tab VI (Incident/Investigation Report), at [D131, D135].

[195] Doc. no. 72 (Second Amended Complaint) ¶¶ 32-41.

Sergeant Ramsey and Officer Lucas each contend that they are entitled to qualified immunity from plaintiffs' claims.[196]  The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their individual capacities, so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Courts generally apply a two-part test for evaluating entitlement to qualified immunity.  The "threshold question" is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right."  *Saucier v. Katz,* 533 U.S. 194, 201 (2001).[197]  If the threshold question is answered affirmatively, the court will proceed to analyze the second aspect of the two-part inquiry:  *i.e.,* "whether the right was clearly established."  *Id.*[198]

---

[196] Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 22.

[197] The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).  Here, "[t]here is no question [that] Sergeant Ramsey and Officer Lucas were performing discretionary functions with respect to the challenged actions in this case (*i.e.*, executing a search warrant and effecting warrantless arrests)."  Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 31 n. 32 (alterations supplied).

[198] The Supreme Court has relieved the lower courts from mandatory adherence to the order of the two-part analysis that was articulated in *Saucier.  See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").  It is now within this court's discretion to assume that a constitutional violation occurred for the purpose of addressing whether that violation would be "clearly established."  *Id.*  That said, and under the circumstances of this case, the court will follow the sequence of analysis in *Saucier*.

### A.    Illegal Search

Plaintiffs allege that:

> Probable cause to search the Roddy family's hotel room and to arrest Dr. and Mrs. Roddy both depend on whether probable cause existed, upon Dr. Roddy's initial hotel encounter with the Huntsville police, to believe that Dr. Roddy had committed a crime, *i.e.*, illegally possessed the scheduled medications found in the pill case in his pants pocket.  But, Defendants lacked even arguable probable cause then to believe Dr. Roddy had committed a drug-related offense — and thus to believe that contraband or evidence related to that non-existent crime would be found in the Roddy family's hotel room.  Defendant Ramsey thus lacked probable cause to seek a warrant to search the hotel room.[199]

Further, plaintiffs assert that Sergeant Ramsey omitted certain information from the search warrant affidavit.[200]  The allegedly omitted information indicated that:

> 1) Dr. Roddy was informing the officers that he a) possessed all the pills lawfully (*i.e.*, stating he is a physician, the medications in the pill box were prescribed to him and his children, and he has prescriptions for each of the medications in the pill case); and b) had a ready way to verify that (*i.e.*, stating the labeled prescription bottles are in the family's hotel room — which the ensuing search confirmed); 2) nothing prohibited Dr. Roddy carrying scheduled medications in unlabeled containers such as his plastic pill case; and 3) Ramsey had taken no steps to test the initial method Dr. Roddy offered to prove the prescriptions, before Ramsey arrested him and then sought the search warrant.[201]

Another district court within the Eleventh Circuit has observed that

---

[199] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 25.

[200] *Id.* at 33.

[201] *Id.*

"qualified immunity does not protect an officer who seeks a warrant where 'a reasonably well-trained officer . . . would have known that his affidavit failed to establish probable cause[202] and that he should not have applied for the warrant.'" *Kelly* [*v. Curtis*], 21 F.3d [1544,] 1553 [(11th Cir. 1994)] (quoting *Malley* [*v. Briggs*], 475 U.S. [335,] 345 [(1986)]).  Alternatively stated, an officer of the law must have "arguable probable cause" to seek a warrant. *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 996 (11th Cir. 1995).  The determination is not unlike a sufficiency of the evidence determination; the court should "determine 'whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed.'" *Id.*

*O'Ferrell v. United States*, 998 F. Supp. 1364, 1370 (M.D. Ala. 1998) (alterations and

footnote supplied).  The Eleventh Circuit has also observed that:

A search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, *see Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676, 57 L. Ed. 2d 667 (1978), and this rule includes material omissions, *see United States v. Martin*, 615 F.2d 318, 328-29 (5th Cir. 1980).  Nonetheless, the

---

[202] "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id.* (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).  Courts have recognized that "[t]he probable-cause standard [often] is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (alterations supplied).  *See also Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.") (alteration supplied).  The best that can be said is this:  probable cause to effect an arrest exists if, at the moment the arrest was made, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the person arrested either had committed, or was in the process of committing, an offense. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (alteration supplied) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  *See also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

> warrant is valid if, absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause. *See Franks*, 438 U.S. at 171-72, 98 S. Ct. at 2684.

*Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002).

Thus, in the context of "claims that the officers violated [the plaintiff's] rights under the Fourth Amendment both by including false statements in the search warrant affidavit and by failing to disclose [exculpatory information] in the affidavit," a district court must answer two questions: one, whether the officer "deliberately or recklessly misstated the evidence or omitted any material fact which would negate a finding of probable cause; and two, whether "the omission of which [the plaintiff] complains . . . defeat[s] the probable cause determination." *Dahl*, 312 F.3d at 1235 (alterations supplied).

### 1.    Claim against Sergeant Jason Ramsey

This court will begin by discussing plaintiffs' illegal search claim against Huntsville Police Sergeant Jason Ramsey.  As noted in the block-quoted text accompanying note 87, *supra*, Sergeant Ramsey's search warrant affidavit explained his basis for suspecting plaintiffs of using their hotel room as a "base of operations" for selling controlled substances.  In substance, he stated that the Huntsville Police had received a 911 call alleging that Dr. Roddy pulled a gun on an Embassy Suites guest, and that officers found Dr. Roddy with a gun, pills, and a large amount of

wadded-up cash in different denominations on his person.[203]   Those facts plainly

support a finding that Sergeant Ramsey had "arguable probable cause to seek a

warrant" to search the Roddys' hotel room.  *O'Ferrell*, 998 F. Supp. at 1370.

Plaintiffs argue that Sergeant Ramsey's affidavit omitted Dr. Roddy's assertion

that he "possessed all the pills lawfully."[204]   However, the affidavit stated that Dr.

Roddy claimed that the pills "belong to him and his family and were a two day

supp[l]y."[205]   While Sergeant Ramsey could have written the affidavit more clearly,

the quoted sentence conveys Dr. Roddy's claim that he possessed the pills lawfully

because they were prescribed for him or members of his family.

Plaintiffs next assert that Sergeant Ramsey omitted the fact that he "had a ready

way to verify" Dr. Roddy's "lawful possession" claim, because Dr. Roddy was

"stating the labeled prescription bottles are in the family's hotel room — which the

ensuing search confirmed."[206]   Further, plaintiffs argue that Sergeant Ramsey should

have stated in the search warrant affidavit that he "had taken no steps to test the initial

method Dr. Roddy offered to prove the prescriptions."[207]   However, plaintiffs do not

---

[203] *See supra* note 86 and accompanying text.  *See also* doc. no. 91-28 (Search Warrant Affidavit), at 2 [D20] (capitalization omitted) (alterations supplied).

[204] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 33.

[205] *Id.* (alteration suppplied).

[206] *Id.*

[207] *Id.*

cite any evidence to show that Dr. Roddy "offered" to allow Sergeant Ramsey to access his hotel room in order to find the labeled prescription bottles.  Further, plaintiffs cite no law requiring an officer to state in a search warrant affidavit that he has not searched the very premises for which he seeks a search warrant.  Thus, neither omission "defeat[s] the probable cause determination."  *Dahl*, 312 F.3d at 1235 (alteration supplied).

Plaintiffs also argue that Sergeant Ramsey omitted the fact that "nothing prohibited Dr. Roddy carrying scheduled medications in unlabeled containers such as his plastic pill case."[208]  However, the *Dahl* inquiry focuses on whether an officer "deliberately or recklessly misstated the *evidence* or omitted any material *fact* which would negate a finding of probable cause."  *Dahl*, 312 F.3d at 1235 (emphasis supplied).  The *Dahl* inquiry does not ask whether the officer fully and accurately stated the governing *law*.  Indeed, while the magistrate who signed the search warrant for the hotel room had to rely on Sergeant Ramsey's statement of the *evidence* and *facts*, because only the officers on the scene had knowledge of those matters, the magistrate did not have to rely on Sergeant Ramsey's statement of the governing *law* on possession of controlled substances, because he could have performed independent research on that issue.  Thus, Sergeant Ramsey's omission of law does not "defeat the

---

[208] *Id.*

probable cause determination." *Dahl*, 312 F.3d at 1235.

For all of the foregoing reasons, this court will grant summary judgment on plaintiffs' illegal search claim against Sergeant Ramsey.

### 2.     Claim against Officer Terry Lucas

The record is devoid of evidence that Huntsville Police Officer Terry Lucas played any part in *applying* for the warrant to search the Roddys' hotel room.  Officer Lucas testified, without contradiction, that his only involvement was assisting in the *execution* of the search warrant for the hotel room.[209]  Accordingly, this court will grant summary judgment on plaintiffs' illegal search claim against Officer Lucas.  *See Dahl*, 312 F.3d at 1235 ("The warrant affidavit upon which this claim is based was submitted only by Beeson, and Dahl points to no evidence that the other officers played any role in applying for the warrant.  On this basis alone, the other officers were entitled to summary judgment.").

### 3.     Claim against the City of Huntsville

Plaintiffs' illegal search claim against the City of Huntsville requires the commission of an unlawful search by Sergeant Ramsey or Officer Lucas.[210]  In the absence of proof that either defendant violated plaintiffs' federally-protected rights,

---

[209] Doc. no. 91-4 (Deposition of Officer Lucas), at 67.

[210] Doc. no. 72 (Second Amended Complaint) ¶¶ 32-36.

this court must grant summary judgment on plaintiffs' illegal search claim against the

City of Huntsville.

## B.   Unlawful Seizure, Arrest, and Imprisonment

Plaintiffs allege that:

> Defendant Ramsey first arrested Dr. Roddy without a warrant after the pat-down in the hotel's tenth floor hallway, but before he left to get the warrant to search the family hotel's room.  Ramsey's lack of even arguable probable cause to believe Dr. Roddy committed a crime rendered Ramsey's original arrest illegal.[211]

Plaintiffs also assert that Sergeant Ramsey arrested Mrs. Roddy after searching the

hotel room, despite "abundant" proof that the plaintiffs lawfully possessed the 987

pills found therein.  Further, plaintiffs allege that:

> At the hotel during the search, Wendy Roddy told Ramsey that Dr. Roddy is commonly called Mike, and William Meyer and Mike are the same person.  Dr. Roddy's briefcase, searched by Defendant Lucas, contained paperwork with the names "William Roddy" and "Mike Roddy," with the (same) correct residence address; as well as some prescription bottles in the name of "Mike Roddy" and others in the name of "William Roddy."   Wendy Roddy offered Ramsey cell phone numbers for Dr. Roddy's physician and pharmacist, to confirm there were valid prescriptions and that "Mike" and "William" are the same person, but Ramsey refused the numbers.  Mrs. Roddy also offered Ramsey access to their vehicle, where Ramsey could find paperwork in the name of "Mike Roddy," but Ramsey rejected that too.  After arguing with Mrs. Roddy at length and refusing to believe "William" and "Mike" are not the same person, Ramsey arrested Mrs. Roddy (charging her with trafficking controlled substances – heroin) . . . . [At the jail,] Dr.

---

[211] *Id.* at 37 (footnote omitted).

Roddy too told Ramsey he is commonly called "Mike," and Mike Roddy and William Meyer Roddy are the same person.  He too begged Ramsey to take the cell phone numbers for his physician and pharmacist and call them[.][212]

The Eleventh Circuit has held that, even though an arrest made without probable cause is unconstitutional,

> officers who make such an arrest are entitled to qualified immunity if there was arguable probable cause for the arrest. *Lindsey v. Storey*, 936 F.2d 554, 562 (11th Cir.1991); *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir.1990).  Qualified immunity will shield [the arresting officers] from a claim of false arrest without probable cause if there was arguable probable cause, *i.e.*, if a reasonable police officer, knowing what [the arresting officers] knew, could have believed there was probable cause for the warrantless arrest.  *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir.1997), *cert. denied*, [525] U.S. [870], 119 S. Ct. 165, 142 L. Ed. 2d 135 (1998); *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir.1995).

*Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999) (alterations supplied) (footnotes omitted).  "[W]hat counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."  *Id.* (alteration supplied).

### 1.    Claim against Sergeant Jason Ramsey

This court will begin by discussing plaintiffs' unlawful seizure, arrest, and

---

[212] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 38 (alterations supplied).

imprisonment claim against Huntsville Police Sergeant Jason Ramsey.  As noted in Section III(A)(1), *supra*, the Huntsville Police received a 911 call alleging that Dr. Roddy pulled a gun on an Embassy Suites guest.[213]  When officers responded to the call, they found Dr. Roddy with a gun, pills, and a large amount of wadded-up cash in different denominations on his person.[214]  Those facts unquestionably support a finding that Sergeant Ramsey had at least arguable probable cause (if not probable cause) to arrest Dr. Roddy.  *O'Ferrell*, 998 F. Supp. at 1370.

Further, when police officers searched the Roddys' hotel room, they found at least 987 pills, over 300 of which were Oxycontin or Oxycodone pills, Schedule II controlled substances.[215]  Although Dr. Roddy's full name is Dr. *William Meyer* Roddy, many of the pills were prescribed to "Dr. *Mike* Roddy."[216]  Officers also found various documents, some bearing the name "*William* Roddy," and others the name "*Mike* Roddy."[217]  Those facts likewise supports a finding that Sergeant Ramsey had at least arguable probable cause to continue to detain Dr. Roddy and arrest Mrs.

---

[213] *See, e.g.*, doc. no. 91-28 (Search Warrant Affidavit), at 2 [D20].

[214] *See id.*

[215] *See supra*; doc. no. 91-39 (Photographs, Part X), at [D115]; doc. no. 91-40 (Photographs, Part XI), at [D119].

[216] *See supra*; doc. no. 91-39 (Photographs, Part X), at [D115]; doc. no. 91-40 (Photographs, Part XI), at [D119].

[217] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), at 234-35; doc. no. 91-4 (Deposition of Officer Lucas), at 43; doc. no. 91-23 (Affidavit of Sergeant McCarver), Tab 1 (STAC Report Case No. V10-244), at 4 [D10]; doc. no. 107 (Stipulation), Tab I.

Roddy.

Plaintiffs have not established that Sergeant Ramsey ignored "abundant" proof that plaintiffs *lawfully possessed* the 987 pills found in their hotel room.[218]

> While [the Eleventh Circuit] recognize[s] that "[a]n arresting officer is required to conduct a reasonable investigation to establish probable cause," *Rankin* [*v. Evans*], 133 F.3d [1425,] 1435, [(11th Cir. 1998)] "once an officer makes an arrest based on probable cause, he need not investigate every claim of innocence." *Id.* (internal quotations omitted). An officer does not have to take "every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person." *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) . . . . [W]hile a police officer should consider a suspect's explanation in evaluating the existence of probable cause, he "is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988). The Supreme Court has explained: "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted — indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979).

*Williams v. City of Homestead*, 206 F. App'x 886, 888-89 (11th Cir. 2006) (alterations supplied).

Because "the facts as initially discovered provide probable cause," Sergeant Ramsey had no duty to "give credence to" Mrs. Roddy's story that Dr. Roddy is also known as "Mike." *Williams*, 206 F. App'x at 888-89. Likewise, Sergeant Ramsey

---

[218] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 38 (alterations supplied).

had no obligation to take "every conceivable step" to investigate her story by calling Dr. Roddy's physician and pharmacist or searching the Roddys' auto for documents confirming Dr. Roddy's identity. *Id.*

Further, the fact that some pills and documents bore the name "Dr. *William* Roddy," and others the name "Dr. *Mike* Roddy," is susceptible to multiple reasonable interpretations, *one of which is that Dr. Roddy obtained the pills under a false name*. Finally, Dr. Roddy's attempts to prove the Roddys' lawful possession of the pills *after they were arrested and transported to jail* do not affect the issue of whether Sergeant Ramsey had arguable probable cause *to make the arrests*.

For all of the foregoing reasons, this court will grant summary judgment on plaintiffs' unlawful seizure, arrest, and imprisonment claim against Sergeant Ramsey.

### 2.    Claim against Officer Terry Lucas

This court will grant summary judgment on the claim against Officer Lucas for the same reasons as the claim against Sergeant Ramsey, as well as for the numerous other reasons discussed below.  Plaintiffs allege that:

> while Mrs. Roddy was in the hotel bedroom trying at length to convince get Ramsey to understand Mike and William are the same person, Ex. B (Wendy Roddy Dep.), at 102, Lucas was also in the bedroom searching through Dr. Roddy's briefcase.  Ex. C (Ramsey Dep.), at 194-95.   Between Lucas hearing the extended conversation about whether Mike is William, finding numerous Oxycontin prescription bottles in the briefcase in Mike Roddy's name, and seeing numerous

papers in the briefcase in both the names of both Mike and William and with the same address, a jury could find Lucas was aware that i) Mike and William are the same, ii) Dr. Roddy in fact had valid prescriptions for all the Oxycontin the officers found, iii) there was no probable cause to arrest either Dr. or Mrs. Roddy for unlawful possession, iv) Lucas had an opportunity to intervene to prevent or undo an unlawful arrest, *e.g.*, by instructing his junior officer Ramsey not to arrest Mrs. Roddy and to release Mr. Roddy, but v) Lucas failed to take any steps to intervene.[219]

To establish § 1983 liability for false arrest, the Eleventh Circuit requires a plaintiff to show:

> "proof of an affirmative causal connection" between a government actor's acts or omissions and the alleged constitutional violation, which "may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986). Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action.

*Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010). Where an officer "did not arrest [the plaintiff] and had no supervisory control over the officer who did, qualified immunity is appropriate." *Id.* (alteration supplied).

Here, Officer Lucas "did not arrest [plaintiffs]." *Id.* (alteration supplied). He did not arrive at the Embassy Suites until after Dr. Roddy's arrest, and he did not make the decision to place either plaintiff under arrest.[220] Further, Officer Lucas "had

---

[219] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 45 n.60.

[220] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 89-91; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 118-19.

no supervisory control over the officer who did [arrest plaintiffs]": *i.e.*, Sergeant Ramsey. *Brown*, 608 F.3d at 737 (alteration supplied). Plaintiffs do not cite any evidence to support their argument that Sergeant Ramsey was the "junior officer" of Officer Lucas.[221]   At the time of plaintiffs' arrests, both Ramsey and Lucas were Huntsville Police Officers who served on the Huntsville-Madison County Strategic Counterdrug Team ("STAC").[222]   (Since the arrests, Ramsey was promoted to Sergeant and left the STAC, but Lucas remains an Officer with the task force.[223]) Because Ramsey and Lucas held the same rank, neither had "supervisory control" over the other. *Brown*, 608 F.3d at 737.

Officer Lucas had no clearly established duty to intervene to prevent, much less undo, an unlawful arrest by a police officer of equal rank. *See Jones*, 174 F.3d at 1286 ("There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct."); *Mehta v. Foskey*, 877 F. Supp. 2d 1367, 1380 n.12 (S.D. Ga.

---

[221] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 45 n.60.

[222] Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 6 n.4; doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 6 n.4; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 12; doc. no. 91-4 (Deposition of Officer Lucas), at 4.

[223] Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 6 n.4; doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 6 n.4; doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. I), at 23; doc. no. 91-4 (Deposition of Officer Lucas), at 4..4.

2012) ("[T]he Court is aware of [no authority], from the Eleventh Circuit or the Supreme Court, holding that a law enforcement officer can be liable under § 1983 for failing to intervene when another officer performs an unlawful arrest.") (alterations supplied); *McGuire v. City of Montgomery*, No. 2:11-CV-1027-WKW, 2013 WL 1336882, *14 (M.D. Ala. Mar. 29, 2013) ("[I]t is unclear whether the duty to intervene exists for constitutional deprivations other than excessive force.") (alteration supplied); *Lewis v. Blue*, No. 2:09-CV-862-WKW, 2010 WL 730210, *6 (M.D. Ala. Mar. 3, 2010) ("[C]ase law seems to indicate that failure to intervene claims are cognizable only when related to excessive force violations.") (alteration supplied).

Further, even assuming that Officer Lucas had a duty to intervene to prevent (or undo) unlawful arrests by Officer Ramsey, and that either "the extended conversation about whether Mike is William," or the "numerous papers in the briefcase in both the names of both Mike and William and with the same address" showed the absence of arguable probable cause for the arrests of both plaintiffs,[224] plaintiffs cite no evidence to support their argument that Officer Lucas heard that "conversation," or saw those " papers." Accordingly, plaintiffs have not proven that Officer Lucas *knew* that the arrests were unlawful, as plaintiffs contend; and, thus, he

---

[224] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 45 n.60.

had no duty to intervene.[225] *See Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1226 (M.D. Ala. 2012) ("Shoupe's uncontradicted affidavit states that he never saw the altercation, meaning that he had no basis to gauge whether Norgard lacked probable cause to arrest Exford to begin with.  This alone entitles Shoupe to qualified immunity.").

For all of the foregoing reasons, this court will grant summary judgment on plaintiffs' unlawful seizure, arrest, and imprisonment claim against Officer Lucas.

### 3.     Claim against the City of Huntsville

Plaintiffs' unlawful seizure, arrest, and imprisonment claim against the City of Huntsville requires the commission of an illegal seizure, arrest, and imprisonment by Sergeant Ramsey or Officer Lucas.[226]  In the absence of such proof, this court must grant summary judgment on plaintiffs' unlawful seizure, arrest, and imprisonment claim against the City of Huntsville.

### IV.  PLAINTIFFS' SUPPLEMENTAL STATE-LAW CLAIMS

Plaintiffs assert supplemental state-law claims for false arrest/false imprisonment, malicious prosecution, and conversion against the City of Huntsville, Huntsville Police Sergeant Jason Ramsey, and Huntsville Police Officer Terry

---

[225] Doc. no. 91-4 (Deposition of Officer Lucas), at 41-43, 57-58.
[226] Doc. no. 72 (Second Amended Complaint) ¶¶ 37-41.

Lucas.[227]  Further, plaintiffs assert a state-law claim for "outrage" against Sergeant Ramsey and Officer Lucas.[228]

In response to defendants' motions for summary judgment, plaintiffs "do not dispute that Defendant [the] City [of Huntsville] cannot be liable for malicious prosecution, conversion, or outrage[.]"[229]  Accordingly, and assuming that plaintiffs stated such claims against the City, this court will grant summary judgment on those claims.

The City of Huntsville, Sergeant Ramsey, and Officer Lucas each assert that they are entitled to state-agent immunity from plaintiffs' remaining claims.[230]  State-agent immunity extends to "governmental units . . . authorized to appoint [law-enforcement] officers," and also to individual law enforcement officers.  *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1227 (Ala. 2002) (alteration in original) (interpreting Ala. Code § 6-5-338(b) (1975)).

The Alabama Supreme Court held in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), that:

> A State agent *shall* be immune from civil liability in his or her

---

[227] *Id.* ¶¶ 42-51.

[228] *Id.* ¶¶ 52-54.

[229] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 50 n.71 (alterations supplied).

[230] Doc. no. 90 (Brief in Support of Motions for Summary Judgment), at 40.

personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

(1)   formulating plans, policies, or designs; or

(2)   exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

  (a)   making administrative adjudications;

  (b)   allocating resources;

  (c)   negotiating contracts;

  (d)   hiring, firing, transferring, assigning, or supervising personnel; or

(3)   discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4)   *exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons*; or

(5)   exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

(1)   when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this

54

State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2)     *when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.*

*Ex parte Cranman*, 792 So. 2d at 405 (emphasis supplied).  The Alabama Supreme

court also established

"a 'burden-shifting' process when a party raises the defense of State-agent immunity." *Giambrone* [*v. Douglas*], 874 So. 2d [1046,] 1052 [(Ala. 2003)].  Under this process, [the defendant officer] "bears the burden of demonstrating that [the plaintiff's] claims arise from a function that would entitle [him] to immunity." 874 So. 2d at 1052[.] "If [he makes] such a showing, the burden then shifts to [the plaintiff], who, in order to deny [the officer] immunity from suit, must establish that [the officer] acted *willfully, maliciously, fraudulently, in bad faith*," 874 So. 2d at 1056[,] or that he "*was not exercising his . . . judgment in the manner set forth in the examples in* Cranman." *Ex parte Hudson*, 866 So. 2d [1046,] 1118 [(Ala. 2003)].

*Howard v. City of Atmore*, 887 So. 2d 201, 205 (Ala. 2003) (emphasis and alterations

supplied).  "Allegations of *negligence* are not sufficient to remove the immunity the

City is provided for [an officer's] performance of a discretionary function." *City of

Birmingham v. Sutherland*, 834 So. 2d 755, 762 (Ala. 2002) (emphasis and alteration

supplied) (citing *Ex parte City of Montgomery*, 758 So. 2d 565, 570 (Ala. 1999)).

## A.     False Arrest/False Imprisonment

Under Alabama law, the torts of false arrest and false imprisonment

have different elements. *See Walker v. City of Huntsville*, 62 So.3d 474, 492 (Ala. 2010) (explaining that Alabama Code § 6-5-170 "defines false imprisonment as 'the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty'"); *see also Higgins v. Wal-Mart Stores, Inc.*, 512 So.2d 766 (Ala. 1987) ("in a cause of action for false arrest, a plaintiff must prove that the defendant caused him to be arrested without probable cause"), *overruled on other grounds, Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So.2d 1280 (Ala. 1993).

*Griffin v. Beasley*, No. 2:12-CV-196WHA, 2012 WL 2339779, *15 (M.D. Ala. June 19, 2012). As described in Section III(B)(1), *supra*, in the context of plaintiffs' 42 U.S.C. § 1983 claim for unlawful seizure, arrest, and imprisonment, plaintiffs have not shown that their detentions were "unlawful," or that their arrests were "without probable cause." *Griffin*, 2012 WL 2339779, at *15. Accordingly, this court will grant summary judgment on plaintiffs' state-law claims for false arrest/false imprisonment against all three defendants.

## B. Malicious Prosecution

The Eleventh Circuit has compared federal and Alabama law and held that:

> To establish a *§ 1983* malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004); *Wood* [*v. Kesler*], 323 F.3d [872,] 881 [(11th Cir. 2003)]. As to the first prong, the constituent elements of the common law tort of malicious prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff

56

accused's favor; and (4) caused damage to the plaintiff accused." *Wood* 323 F.3d at 882.  The elements under *Alabama law* for the common-law tort of malicious prosecution are the same, except that they require only a "judicial proceeding" not a "criminal prosecution." *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999).

*Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010) (footnote omitted) (alterations and emphasis supplied).

With respect to the requirement that the criminal prosecution be "instituted or continued by the present defendant," Officer Lucas's only involvement in plaintiffs' criminal case was that of assisting in the execution of the search warrant for their hotel room.[231]  Further, Sergeant Ramsey testified, without contradiction, that the decision to prosecute or dismiss the charges against plaintiffs rested with Madison County Assistant District Attorney James Tolleson, not the Huntsville Police Department or its officers.[232]  The Alabama Supreme Court has held that:

> If a defendant merely gives the district attorney's office information regarding an alleged crime, leaving the decision to prosecute entirely to the uncontrolled discretion of the district attorney, who thereafter makes his own independent investigation and thereupon takes the information before the grand jury which returns indictments against the suspects, the defendant, in a malicious prosecution action, is not regarded as having instigated the criminal proceeding.

*See Alabama Power Co. v. Neighbors*, 402 So. 2d 958, 962 (Ala. 1981).  Thus, plaintiffs have not established that Sergeant Ramsey or Officer Lucas "instituted or

---

[231] Doc. no. 91-4 (Deposition of Officer Lucas), at 67.

[232] Doc. no. 91-3 (Deposition of Sergeant Ramsey, Vol. II), 316-17, 329-31.

continued" plaintiffs' criminal proceedings.  *Grider*, 618 F.3d at 1256.

Further, Madison County Assistant District Attorney James Tolleson successfully moved to *nolle prosse* plaintiffs' criminal charges.[233]  A *nolle prosse* "is a *procedural dismissal* of the charges *without prejudice — not* a *bona fide* termination *in the defendant's favor*."  *Deville v. Marcantel*, 567 F.3d 156, 173 (5th Cir. 2009) (emphasis supplied).  Thus, plaintiffs have not proved that the proceedings were terminated in their favor.  *Grider*, 618 F.3d at 1256.

Moreover, as discussed in Section III(B)(1), *supra*, in the context of plaintiffs' 42 U.S.C. § 1983 claim for unlawful seizure, arrest, and imprisonment, plaintiffs' arrests were supported by "probable cause."  As a result, plaintiffs' seizures were legal.  Thus, plaintiffs have not shown that any of the defendants violated their "Fourth Amendment right to be free from unreasonable seizures."  *Grider*, 618 F.3d at 1256.

For all of the foregoing reasons, this court will grant summary judgment on plaintiffs' state-law claims for malicious prosecution against all three defendants.

## C.   Conversion

Alabama Code § 6-5-260 provides a cause of action in tort for conversion.[234]

---

[233] Doc. no. 91-17 (Affidavit of Assistant District Attorney Tolleson), Tab I (Case Action Summary Sheets with Court Orders); *id.*, Tab II (Motions to *Nolle Prosse*), at [D3941-D3942].

[234] Alabama Code § 6-5-260 states as follows:  "The owner of personalty is entitled to possession thereof.  Any unlawful deprivation of or interference with such possession is a tort for

Alabama Code § 6-5-260 (1975); *see also Dawson v. City of Montgomery*, No. 2:06-CV-1057-WKW [WO], 2008 WL 659800, *25-30 (M.D. Ala. Mar. 6, 2008) (addressing a motion for summary judgment on claim for conversion against an arresting police officer and city).

At some point after their criminal charges were dismissed, plaintiffs attempted to retrieve the evidence seized during the investigation from the Madison County Courthouse.[235]  The facts relevant to the present discussion were described in Part II(I) of this opinion, *supra.* In summary, the plaintiffs do not connect their claim that *Sergeant Ramsey* converted $200 from Mrs. Roddy's purse and $75 from a son's wallet to an act or omission by *Officer Lucas*.  Indeed, plaintiffs argue that a jury "could find *Ramsey* liable for conversion," not *Lucas.*[236]  Accordingly, this court will grant summary judgment on plaintiffs' state-law claim for conversion against *Lucas*.

Plaintiffs' claim against Sergeant Ramsey will fare no better than their claim against Officer Lucas, because neither plaintiff knew the total amount of money seized during the search of their hotel room, or articulated a reasonable, non-speculative basis for believing that some of the money was not returned.  For

---

[235] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 108; doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 147-48; doc. no. 91-22 (Affidavit of Captain Malone), Tab 6 (Incident/Investigation Report), at [D130].

[236] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 50 (emphasis supplied).

example, Mrs. Roddy testified as follows:

> Q.    How much money total was taken?  Bad question.  *How much total money was seized?*
>
> *A.    I don't know.*
>
> Q.    How did you know — if you didn't know how much was seized, how did you know an amount that was taken?
>
> A.    Because I had seen it written down, and the $275 was not a part of it[.][237]

Mrs. Roddy then testified:

> Q.    Did you come to [the Madison County Courthouse to retrieve your belongings] with an understanding, you personally, with an understanding about how much money you were expecting to get back, or is that something Dr. Roddy did?
>
> A.    That's something Dr. Roddy did.[238]

When questioned about Mrs. Roddy's testimony, Dr. Roddy testified as

follows:

> Q.    I think I asked your wife something to the effect of, you know, "Did you know the exact amount?"  And she said, "No.  My husband did."  And I asked her, "Did he have it written down?"  And I think she said, "No.  He had it memorized" or he remembered it or something to that effect.  Is that true?
>
> A.    No.  That's a gross misunderstanding or something because *I couldn't tell you what's in my pocket any day, any time, any week.*

---

[237] Doc. no. 91-2 (Deposition of Wendy Sue Roddy), at 150 (alteration supplied).

[238] *Id.* at 151 (emphasis and alteration supplied).

Q.   I think I asked a bad question.  When you went to retrieve your belongings, did you go there with a number in your head or written down on a piece of paper as to how much money you needed to get back total, regardless of how many counts it came to you in?

A.   I could — *I had a theory at best*, and that which was on the police report plus the [$]275, since it wasn't documented anywhere, and it went in his pocket.

Q.   And what do you mean when you say "a theory at best?"  I don't understand that.

A.   I'm saying I have a great deal of certainty that if it was on the — that I knew what to expect coming back if what was on the police report was accurate in terms of dollars, because I was cognizant of those numbers prior to receipt of evidence.  Are you with me?

Q.   Yes.

A.   But on neither, on the inventory sheet or the police report, was there anything about the [$]200 coming out of my wife's purse and into Ramsey's pocket, nor the [$]75 out of my son's wallet into his pocket.  So, I patiently waited and the amount on the police report was correct, but the [$]275 was not — was not there.

Q.   And how did you know about the $275?

A.   From what my wife said.

Q.   Well, what do you mean? When?

A.   When? When she — when we went home driving, after we got out of jail, said he — you know, she was recalling the events that happened and said he took [$]200 out of her wallet and Eric, my son, had [$]75 designated for some specific things that day in his wallet.  The money from his wallet was taken.

61

Q.  How do you know that the $200 that was taken from your wife's purse, and the $75 you say was taken from your son's purse, was not taken and put with the other money that was taken from your briefcase and your person?

A.  Go ahead.  I'm just — I'm clearing my throat.

Q.  It was notated in the report and that you received all of that back. How do you not know that that happened?

A.  Well, and again, *you can surmise as well as I*.  When that Ramsey was asked where is the [$]200 from my wife's purse and the [$]75 from my son's wallet, he denied taking it.  So, why would he deny it if it were put back into evidence?[239]

Dr. Roddy also testified:

Q.  Regardless of how it was removed from your wife's purse, regardless of how it was maintained in your wife's purse, it does not change the fact that you don't know the total amount that you had?

A.  And I was truthful with you.  *I don't know*, and I'm not going to pretend to know.[240]

In sum, without knowing the total amount of money seized, plaintiffs' claim that some of the money was not returned amounts to (in Dr. Roddy's telling term) pure "surmise."[241]  Of course, "[w]here the circumstantial evidence and reasonable inferences drawn therefrom create a genuine issue of material fact for trial, summary

---

[239] Doc. no. 91-1 (Deposition of William Meyer Roddy), at 111-14 (emphasis and alterations supplied).

[240] *Id.* at 124-25 (emphasis supplied).

[241] *Id.* at 114.

judgment is improper." *Chapman v. American Cyanamid Corp.*, 861 F.2d 1515, 1518-19 (11th Cir. 1988) (alteration supplied). "However, an inference based on speculation and conjecture is not reasonable." *Id.* at 1518. Accordingly, this court will grant summary judgment on plaintiffs' state-law claim for conversion against Sergeant Ramsey.

## D.    Outrage

"The intentional infliction of emotional distress is also known as the tort of outrage" under Alabama law. *Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012). "In order to recover, a plaintiff must demonstrate that the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" *Id.* (quoting *Little v. Robinson*, 72 So. 3d 1168, 1172-73 (Ala. 2011)).

> The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).

*Ex parte Bole*, 103 So. 3d at 52 (quoting *Little*, 771 So. 3d at 1172-73).

> That is not to say, however, that the tort of outrage is viable in only the three circumstances noted . . . . It is clear, however, that the tort of outrage is viable only when the conduct is "'so outrageous in

he

character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"

*Ex parte Bole*, 103 So. 3d at 52-53 (quoting *Little*, 771 So. 3d at 1172-73).

To establish their claim of "outrage," plaintiffs allege that:

> Dr. Roddy, a respected physician, and his wife (and office manager) were falsely charged with felony drug trafficking for nearly a year, even though Defendants knew or clearly should have known Dr. Roddy lawfully possessed all the drugs he was accused [of possessing]; refused to investigate or pursue evidence of innocence; and virtually destroyed his medical practice and the family's livelihood.[242]

Given this court's holding that plaintiffs' arrests were supported by probable cause, the actions of Sergeant Ramsey and Officer Lucas were not "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Ex parte Bole*, 103 So. 3d at 52-53. Accordingly, this court will grant summary judgment on plaintiffs' state-law claims for "outrage" against Sergeant Ramsey and Officer Lucas.

## V. EVIDENTIARY MOTIONS

Defendants have moved to supplement their evidentiary submissions in support of summary judgment by filing two exhibits: *i.e.*, an affidavit from Warrant

---

[242] Doc. no. 99 (Response in Opposition to Motions for Summary Judgment), at 51 (alteration supplied).

Magistrate Lee S. Leggett further explaining why plaintiffs' charges of trafficking in Oxycontin pills were listed as "Trafficking – Heroin"; and, the remainder of the documents found in Dr. Roddy's briefcase during the search of plaintiffs' hotel room.[243]  Plaintiffs oppose the filing of Leggett's affidavit, but do not oppose the filing of the documents from the briefcase.[244]

Further, plaintiffs have moved to strike the affidavit of Madison County Assistant District Attorney James Tolleson on the grounds that:

> other than the first two paragraphs (identifying Tolleson by name and employment background) and the first three sentences of the third paragraph (concerning the arrest and charging of Dr. and Mrs. Roddy and the assignment of their cases to Tolleson to prosecute), nearly the entire remainder of Tolleson's affidavit consists of opinion testimony.[245]

Plaintiffs' motion does not address the exhibits attached to Tolleson's affidavit.

This court's ruling does not rely on the affidavit from Warrant Magistrate Lee S. Leggett, the remainder of the documents found in Dr. Roddy's briefcase, or the affidavit from Madison County Assistant District Attorney James Tolleson.  (It does, however, cite to the "Case Action Summary Sheets with Court Orders" and "Motions to *Nolle Prosse*," attached as Tab I and Tab II to the Tolleson affidavit, the

---

[243] Doc. no. 115 (Motion to Supplement Evidentiary Submissions), at 1.

[244] *Id.*

[245] Doc. no. 117 (Motion to Strike), at 1.

admissibility of which is not in dispute.[246])   Accordingly, this court will deny all parties' evidentiary motions as moot.[247]

## VI.  CONCLUSION AND ORDERS

For the reasons explained above, the motions for summary judgment filed by the City of Huntsville, Sergeant Jason Ramsey, and Officer Terry Lucas are GRANTED.  Defendants' motion to supplement their evidentiary submissions in support of summary judgment, and plaintiffs' motion to strike the affidavit of Madison County Assistant District Attorney James Tolleson, are DENIED as moot.

Plaintiffs' claims are DISMISSED with prejudice.  Costs are taxed to plaintiffs. The Clerk is directed to close this file.

DONE this 23rd day of May, 2013.

_____
United States District Judge

---

[246] Doc. no. 91-17 (Affidavit of Assistant District Attorney Tolleson), Tab I (Case Action Summary Sheets with Court Orders); *id.*, Tab II (Motions to *Nolle Prosse*), at [D3941-D3942].

[247] This court recognizes that defendants have not yet responded to plaintiffs' motion to strike the affidavit of Madison County Assistant District Attorney James Tolleson.  However, a court may deny a motion "as moot, without requiring a formal response from [the opposing party]." *Waldman v. Pitcher*, No. 1:10-CV-238, 2011 WL 4337046, *13 (S.D. Ohio June 21, 2011) (alteration supplied); *see also United States v. Salawu*, No. 04-261-JJF, 2005 WL 1421819, *2 (D. Del. June 17, 2005) ("[T]he Court will deny Defendant's motion to recall the mandate and deny as moot his motions for bail, without further response from the Government, because it is apparent to the Court at this juncture that relief is not warranted.") (alteration supplied).